[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14186
_____

D.C. Docket No. 0:10-cv-61485-WPD

BANTA PROPERTIES, INC.,

Plaintiff-Appellee,

versus

ARCH SPECIALTY INSURANCE COMPANY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 24, 2014)

Before CARNES, Chief Judge, WILSON and FAY, Circuit Judges.

PER CURIAM:

Arch Specialty Insurance Company ("Arch") appeals a jury verdict awarding Banta Properties, Inc. ("Banta Properties") damages from the breach of a commercial property insurance policy following storm damage to three apartment complexes.  The legal issue before us is whether a company, whose sole interest in property is the contractual right to receive 4% of gross income, can recover from an insurance policy the cost of repairing physical damage far in excess of its revenue stream.  We conclude that Florida's insurable interest statute, Fla. Stat. § 627.405, precludes recovery beyond the company's revenue stream from the property.  We reverse the district court's denial of Arch's motion for judgment as a matter of law, and remand for entry of a judgment in favor of Arch.

## I. BACKGROUND

Banta Properties is one of many companies owned by Catherine Banta, Bradford Banta, and others (collectively, "Banta Family").[1]  Banta Properties serves as the property management company for three apartment complexes in Broward County, Florida.  The three complexes, Parkcrest Apartments, Colonial Park Apartments, and Westwood Apartments are all separate legal entities that are

---

[1] Banta Properties, Inc. is a Florida corporation.  The testimony regarding who exactly comprised the Banta Family was nebulous, but Bradford and Catherine Banta were the most involved.  Bradford Banta serves as a principal and the registered agent of Banta Properties.  He is an attorney licensed in Florida.

2

not owned by Banta Properties.[2]  In exchange for managing the complexes, the owners paid Banta Properties 4% of gross income.

In April 2005, Banta Properties purchased commercial property insurance for the three apartment complexes.  The property insurance coverage consisted of two policies.  The primary policy was issued by General Star Indemnity Company ("General Star"), and it provided coverage for damage up to $2.5 million, not including the $550,186.50 deductible.  The second, excess, policy was issued by Arch and provided $8.5 million in additional coverage.  Under the excess insurance policy, Arch's obligation to satisfy a claim is triggered only if the recoverable damage reaches the attachment point of the excess policy.

In October 2005, the three complexes were severely damaged by Hurricane Wilma.  Due to the storm, the complexes suffered approximately $39,000 in lost rents.  Banta Properties's 4% share of those lost rents is approximately $1,600.  Banta Properties immediately began the claims process with General Star and sought a $39,000 business interruption claim for physical damage to the complexes, which General Star paid.  In March 2008, Banta Properties and General Star settled the remaining claims, exhausting the policy limit of $2.5 million.  Banta Properties then informed Arch of the loss.  The parties were unable to

---

[2] Catherine Banta testified regarding the legal entities that actually owned the apartment complexes.  Parkcrest was organized as a conglomerate of limited liability companies, Colonial Park was operated as a land trust, and Westwood was organized as "Westwood Apartments, L.L.C."

resolve the claim, and Banta Properties sued Arch in August 2010. The case proceeded to trial, and the jury rendered a verdict in favor of Banta Properties. The jury found Banta Properties had a $5 million insurable interest in the complexes and had suffered $4 million in injury to that insurable interest. After accounting for the amount paid by General Star, the deductibles, and prejudgment interest, the district court entered a $1,299,646.26 judgment in favor of Banta Properties. Arch moved for judgment as a matter of law at trial and properly renewed the motion, but the district court denied both motions. Arch appeals the district court's denial of the motions.

## II. STANDARD OF REVIEW

We review the denial of a motion for judgment as a matter of law de novo and apply the same standard as the district court. *See Chaney v. City of Orlando*, 483 F.3d 1221, 1227 (11th Cir. 2007). "Under [Federal] Rule [of Civil Procedure] 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004) (citing Fed. R. Civ. P. 50). We review the entire record and "draw all reasonable inferences in favor of the nonmoving party." *Id.* at 1192–93.

## III. DISCUSSION

The complication in this case arises from the ownership of the apartment complexes. In April 2005, when the property insurance was obtained, the Banta Family owned the separate legal entities comprising Parkcrest, Colonial Park, and Westwood. The Banta Family, however, was not the named insured, and is not the plaintiff in this case. Instead, "Banta Properties, Inc." was the named insured on the primary and excess policies, while "Colonial Park Apts," "Parkcrest Apts," and "Westwood Apts LLC" were additional named insureds.[3] Further, in August 2005, prior to Hurricane Wilma and the loss at issue, the Banta Family sold Parkcrest to an unrelated nonparty, while Banta Properties continued to serve as the property management company.

Although the parties generally agree on the facts underlying this case, they disagree on the law. Arch argues that the amount of Banta Properties's insurable interest is limited to its revenue stream from the complexes, namely 4% of gross income. Banta Properties argues the Banta Family's ownership interest in the complexes covered by the excess insurance policy allows it to recover for physical damage to all of the properties. Banta Properties also argues that it had a contractual obligation to procure insurance, and that obligation created an insurable interest.

---

[3] The apartment complexes do not appear on the Arch policy as additional named insureds, but Arch's representative testified that Arch's policy adopted the additional named insureds in the primary policy.

5

A. Banta Properties's Insurable Interest

Under Florida law, property insurance contracts are enforceable only where the insured has an insurable interest in the covered property at the time of the loss. *See* Fla. Stat. § 627.405(1). An insured does not need to own property to have an insurable interest. *Aetna Ins. Co. v. King*, 265 So. 2d 716, 718 (Fla. Dist. Ct. App. 1972). Instead, Florida law defines an insurable interest as an "actual, lawful, and substantial economic interest" in keeping the property "free from loss, destruction, or pecuniary damage or impairment." Fla. Stat. § 627.405(2). "The measure of an insurable interest in property is the extent to which the insured might be damnified by loss, injury, or impairment thereof." Fla. Stat. § 627.405(3); *see Travelers Indem. Co. v. Duffy's Little Tavern*, 478 So. 2d 1095, 1096 (Fla. Dist. Ct. App. 1985).

On appeal, the parties now agree that Banta Properties, as a matter of law, can have an insurable interest in the complexes it manages, but disagree on the extent of that interest. As a federal court sitting in diversity, we normally look to decisions of the state's highest court to resolve issues of state law. *Allstate Life Ins. Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005). The Florida Supreme Court, however, has not spoken on the extent of a nonowner's insurable interest under Section 627.405 of the Florida Statutes. In the absence of authority from the Florida Supreme Court, we are bound by the decisions of Florida's appellate courts

6

unless there is persuasive indication the Florida Supreme Court would rule otherwise. *Id.*

Florida's appellate courts have addressed the extent of a nonowner's insurable interest in real property. In *Duffy's Little Tavern*, the plaintiff sought the balance of its property insurance policy after a fire destroyed a building. *See* 478 So. 2d at 1095. While the plaintiff did not own the building, it was the lessee and held an unexercised option to purchase the building. The trial court awarded $165,000, the policy limit, but the appellate court reversed, concluding that $165,000 represented the insurable interest of an owner, not a lessee, and thus exceeded the plaintiff's insurable interest. The appellate court found, as a matter of law, that the plaintiff's limited insurable interest as a lessee could, at most, include "the value of the use of the building during the unexpired term of the lease as well as the value of the leasehold improvements." *Id.* at 1096.

In sum, the measure of an insurable interest is the loss the insured might suffer from damage to the property. *See* Fla. Stat. § 627.405(3). *Duffy's Little Tavern* explains that the statute limits a nonowner's insurable interest in property to the value of a potential loss of those rights in the property.[4] 478 So. 2d at 1096.

---

[4] The district court relied on *Aetna Insurance Co. v. King*, 265 So. 2d 716, 718 (Fla. Dist. Ct. App. 1972), where a Florida appellate court upheld a verdict awarding a nonowner $13,083.39 for destruction of a building due to fire. While we reach a different outcome, we find no conflict. The opinion in *King* does not specify what the amount recovered represents, but even if it was for physical damage, the nonowner had the contractual right to receive *all* the income from the property. The value of the right to receive all the income from property is

7

Banta Properties actually had no property rights in the apartment complexes whatsoever. The only right Banta Properties had at the time of loss was the contractual right to receive 4% of gross income in exchange for its service as property manager. The sole injury Banta Properties could have suffered from the impairment or destruction of the apartment complexes was the loss of revenue from that contractual right. We conclude that Florida law thus limits the extent of Banta Properties's insurable interest to the potential loss of that revenue.

B. Banta Properties's Assertion of the Owners' Interests

Perhaps recognizing the limits of its own insurable interest, Banta Properties argues two ways to impute the insurable interest of the owners to itself. Banta Properties first argues its suit is asserting the interest of the Banta Family. Both parties devoted considerable time arguing about whether the interests of the Banta Family are properly represented on the policies, and whether Banta Properties's suit is on behalf of those interests. However, we need not resolve these arguments because the loss to the Banta Family's insurable interest was insufficient to trigger Arch's liability under the excess policy.

At trial, Banta Properties asserted $6.1 million in damage to the apartment complexes. Of that asserted loss, $3.5 million was from damage to the Parkcrest

---

approximately the value of the property. *Cf. United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598, 606–07 (5th Cir. 1961) (recognizing capitalization of net income as one measure of fair market value).

8

complex. Banta Properties therefore claimed, at most, $2.6 million in damage to the Colonial Park and Westwood complexes. But Banta Properties's policy with Arch is an excess policy, which requires the damage to exceed the coverage of the primary policy. The primary policy covers $2.5 million in damage plus a $550,186.50 deductible, or approximately $3 million total. The $2.6 million in asserted damage to Colonial Park and Westwood is less than the $3 million attachment point. Even if we attribute to Banta Properties all of the insurable interests of the Banta Family, Banta Properties must still show the Banta Family had an insurable interest in the Parkcrest complex to recover against Arch.

Moreover, the insurable interest must have existed at the time of the loss. *See* Fla. Stat. § 627.405(1). But the Banta Family had no insurable interest in Parkcrest when Hurricane Wilma occurred in October 2005, because they had sold their interest in Parkcrest to a nonparty in August 2005. Therefore, Banta Properties cannot prevail, even assuming this suit is on behalf of the Banta Family as a whole.[5]

### C. Banta Properties's Contractual Obligation to Procure Insurance

Banta Properties finally argues it had a contractual obligation to procure insurance for the complexes on behalf of the owners. Banta Properties asserts that

---

[5] Banta also cannot claim an interest on behalf of the new owner of Parkcrest. The Banta Family at least owned Parkcrest when the policy was procured in April 2005, so arguably the policy could have been for their benefit. However, the new owner of Parkcrest could not possibly be a beneficiary under Arch's policy, because the policy included a nonassignment clause, and there is no evidence Arch consented to assignment.

the obligation creates an insurable interest because it would face liability for failing to procure insurance. Presumably because the written property management contracts[6] do not support such a contractual obligation, Banta Properties asserts that the obligation exists outside of its written agreements.

This argument fails. First, Banta Properties's written management agreement with the owner of Parkcrest appears to place the obligation to procure insurance on the owner.[7] Second, the Parkcrest agreement expressly designates Banta Properties as an independent contractor, not an agent, and states Banta Properties "shall not be entitled to execute any contracts or otherwise bind the owner under any continuing legal obligations which are outside the day to day operation of [Parkcrest]." Pl.'s Ex. 118 at 3 (R-Acc. #7). Finally, the testimony of Banta Properties's corporate representative completely contradicts the assertion that Banta Properties has a separate, nonwritten, contract requiring it to obtain insurance for any of the complexes. The corporate representative testified that, other than its oral agreement to perform as a general contractor for repair of the damage from Hurricane Wilma, Banta Properties had no other oral agreements with the owners of any of the complexes. Finding no evidence of either a written

---

[6] Parkcrest and Colonial Park had written agreements, but Westwood did not.

[7] From the Parkcrest Management Agreement: "Owner agrees to maintain liability insurance in amount of not less than $1,000,000.00 and such insurance policy shall name Manager as additional named insured." Pl.'s Ex. 118 at 3 (R-Acc. #7). Thus, the only obligation the Parkcrest Agreement creates is an obligation to obtain a different kind of insurance, and it puts that obligation on the owner, not on the management company.

10

or nonwritten obligation to procure insurance, we need not decide whether that obligation would create an insurable interest.

## IV. CONCLUSION

The Banta Family created numerous business entities to manage its business ventures. Consequently, they are bound to both the benefit and burden of the limited liability and interests of the entities.[8] The only plaintiff in this suit is Banta Properties, a company that obtained insurance for buildings it never owned, only managed. The sole injury Banta Properties suffered to its insurable interest due to Hurricane Wilma was $1,600, its 4% share of $39,000 in business interruption. This claim was paid by the primary insurance policy, and, more importantly, does not support the approximately $3 million injury it needed to suffer to trigger Arch's liability under the excess insurance policy.

The judgment of the district court is reversed, and the case is remanded for entry of a judgment in favor of Arch.[9]

**REVERSED and REMANDED.**

---

[8] Bizarrely, this entire suit hinged on the recovery for damage to Parkcrest, a complex the Banta Family sold prior to the storm.

[9] After appeal, the district court indicated, and the parties agree, that the final judgment should be amended to $1,157,505.34 to reflect a correct accounting of the deductibles. Arch moved to remand the case in order to correct the final judgment. In light of our ruling, that motion is moot.

11